IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INDU BAJAJ, | : |
|     Petitioner, | : |
| v. | :   Misc. Action No. 11-286-RGA |
| FISHER ASSET MANAGEMENT, LLC<br>and DANIEL RUBLE, | : |
|     Respondents. | : |

MEMORANDUM OPINION

Robert M. Kramer, Esq., Pittsburg, Pennsylvania; Attorney for Petitioner Indu Bajaj.

Frederick B. Rosner, Esq., Wilmington, Delaware; Emma J. Purdy, Esq., New York, New York; Attorneys for Respondents Fisher Assets Management LLC and Daniel Ruble.

April 10, 2012
Wilmington, Delaware

**ANDREWS, U.S. DISTRICT JUDGE:**

Petitioner Indu Bajaj moves to vacate an arbitration award made in favor of Respondents Fisher Asset Management and Daniel Ruble, an employee of Fisher Asset Management, pursuant to Section 10 of the Federal Arbitration Act ("FAA"). Respondents request that the Court confirm the arbitration award and award them attorneys' fees incurred in opposition to the motion to vacate. The Court denies the petition to vacate, confirms the arbitration award, and awards attorneys' fees to Respondents.

## I. Background

Petitioner filed for arbitration in October 2010. (D.I. 5, p. 1). In her arbitration claim, Petitioner alleged that she suffered losses when Respondents invested her money in high risk equities without her consent and against her stated preference for safer investments. (D.I. 1, Exh. 1 at 7). Petitioner first met with a representative of Fisher Asset Management, Mr. Fliegler, on April 3, 2008. *Id.* at 3. Mr. Fliegler compiled a "Confidential Client Profile" for Petitioner at this meeting. *Id.* Petitioner signed the profile, but alleged at arbitration that it contained statements inconsistent with her financial status and investment wishes.[1] *Id.* Petitioner claimed that Mr. Fliegler never provided her with a copy of the profile; otherwise, she would have brought the inaccuracies to his attention. *Id.* Petitioner testified to discussing with Mr. Fliegler her plan to purchase a house and to keep $250,000 as a cash reserve. Petitioner made clear her unwillingness to take risks in the stock market at a later lunch meeting. *Id.* at 3-4.

On April 22, 2008, Petitioner had a dinner meeting with Mr. Fliegler. *Id.* at 4. Petitioner signed papers transferring her funds into Fisher Asset Management's brokerage account, but did

---

[1] The alleged inaccuracies included that Petitioner had other accounts to draw income from such as a pension, that she did not mandate limitations to holding specific asset classes in the portfolio, that she was not considering any restrictions on certain securities or industry groups, that she planned to withdraw $60,000 per year from the Fisher accounts, that she had not bought or sold mutual funds or individual securities in the preceding 12 months, and that she had never been involved in any litigation or arbitration. *Id.*

2

not yet give permission to Respondents to begin investing her money. *Id.* Petitioner contended that she emphasized her intention to keep $1,000,000 cash on hand and that Mr. Fliegler assured her that her savings would not be invested until she was assigned an investment counselor. *Id.* Her friend, Mr. Jolly, was also present at the latter part of the meeting and testified that he insisted that Petitioner's portfolio include at least 25% of her assets as fixed income investments. *Id.* at 4-5. Mr. Fliegler purportedly agreed to honor this request. *Id.* at 5.

Later in April, Respondent Ruble contacted Petitioner. *Id.* Petitioner denied that Ruble specifically identified himself as her investment counselor. *Id.* On May 8, 2008, Ruble sent Petitioner an e-mail with an investment proposal attached. *Id.* Ruble sent another email on May 16, 2008, concerning the transfer of her brokerage account assets to Fisher Asset Management. *Id.* He also asked her to sign and return a "Partial Funding Letter" that was attached. *Id.* Ruble testified that on this date, a conference call between himself, Petitioner, and Mr. Jolly occurred. *Id.* at 8. Ruble testified that during this call, he provided Petitioner with multiple investment plans and that Petitioner did not inform him of any errors in her investment profile. *Id.* According to Ruble, Petitioner then authorized him to begin investing her funds in a high risk, high reward investment plan, and he began to do so accordingly. *Id.*

Petitioner disputed this version of the events at the arbitration hearing, testifying that she did not recall talking to Ruble on that day and that she certainly did not approve the investment plan or authorize investment of her funds. *Id.* at 5. Petitioner testified that she spoke with Ruble on May 20, but believed that the purpose of the partial funding letter was to enable the transfer of her assets, not to start actual investment. *Id.* at 6. She asserted that Ruble failed to disclose that Respondents had already begun investing her funds. *Id.* Petitioner admitted that Fisher Asset Management emailed Petitioner investment documents, but she claimed to not have always

3

opened them. *Id.* She also claimed to have never received any investment documents via traditional mail because Respondents failed to use her correct address. *Id.*

The market crashed in September 2008 and Petitioner suffered losses. *Id.* at 9. Petitioner ended her business relationship with Respondents in January 2009. *Id.* In her subsequent investments with other companies, Petitioner listed her investment goal as "balanced." *Id.* She continued, however, to take high risk equity positions in her accounts. *Id.*

The Arbitrator held that Petitioner failed to prove that Respondents invested her money without her consent. *Id.* at 10. The Arbitrator explained his reasoning:

> This case rises and falls on the credibility of the witnesses. On one hand, I have the testimony of respondents, testimony that is consistent with the documentary evidence produced at the arbitration. On the other hand, I have testimony of Ms. Bajaj and Mr. Jolly, testimony that directly contradicts the documentary evidence. To explain the conflict in her testimony and the objective evidence, Ms. Bajaj raises unsubstantiated claims of forgery and fraud.

*Id.* at 11. The Arbitrator found that Petitioner submitted no evidence supporting her testimony that her money was invested without her approval. *Id.* at 11-12. Specifically, Petitioner failed to present any evidence that the "Onyx Notes" Respondents submitted to substantiate their defense were "doctored."[2] *Id.* at 11. She further offered no evidence in support of her testimony that her signature on the investment agreement was "photo-shopped." *Id.* Petitioner claimed that Respondents invested her money despite their knowledge that she needed liquid funds to purchase a house, but no documentary evidence supported this allegation. *Id.* at 11.

The Arbitrator further found that Petitioner's testimony was inconsistent with her business dealings. *Id.* at 12. For example, Petitioner stated that she signed a confidential client

---

[2] Fisher Asset Management uses Onyx Notes to memorialize communications between employees and customers. (D.I. 5, p. 2, Fn. 3). Respondents offered Onyx Notes made in connection with Petitioner's customer account as evidence that she in fact consented to the investment plan. (*See* D.I. 1, Exh. 1 at 11). The Arbitrator stated that he did not actually rely on the Onyx Notes in making his decision, as "[t]here was ample evidence in other communications and in the testimony of the witnesses." *Id.* at 11, fn. 5.

4

profile without reading it, but also testified that she was an "experienced, hands-on investor" who always read contracts in her business dealings. *Id.* Moreover, her investment history showed she had always been a "growth" investor, and she continued investing in high risk stocks after ending her business relationship with Respondents. *Id.* The Arbitrator concluded that it was not believable that a sophisticated investor would sign an agreement allowing Respondents to make 100% equity investments at their sole discretion when her true wishes were to the contrary. *Id.* The Arbitrator held that Petitioner did not meet her burden of proof and decided in favor of Respondents. *Id.* at 14.

## II. Review of Arbitrator's Decision

"When parties move to confirm or vacate an arbitration award, the court's function in confirming or vacating a commercial arbitration award is severely limited. Arbitration awards are set aside only in very unusual circumstances, and there is a strong presumption in favor of the arbitration award." *Millennium Validation Services, Inc. v. Thompson*, 2006 WL 3159821, *4 (D. Del. 2006) (internal citations omitted). Under the FAA, a federal district court may vacate an arbitration award in the following circumstances: (1) the award was procured by corruption, fraud, or undue means; (2) there was evident partiality or corruption of the arbitrator; (3) the arbitrator refused to postpone the hearing despite sufficient cause shown, refused to hear material evidence, or prejudiced the rights of a party through other behavior; or (4) the arbitrator exceeded or so imperfectly executed his power that a mutual, final, and definite award was not made. *Id.*; 9 U.S.C. § 10.

Petitioner first argues that Respondents procured the award via fraud. Courts apply a three-part test to determine whether fraud impermissibly affected an arbitration decision. Petitioner "must establish (1) the existence of fraud by clear and convincing evidence, (2) that

5

the fraud was not discoverable with the exercise of due diligence, and (3) that the fraud materially relates to an issue in the arbitration." *Int'l Broth. of Teamsters, Local 701 v. CBF Trucking, Inc.*, 440 Fed. App'x 76, 77-78 (3d Cir. 2011).

Petitioner asserts that Respondents introduced fraudulent Onyx notes into evidence at the arbitration hearing. Petitioner does not prove this fact by clear and convincing evidence and thus fails the first step. The only evidence Petitioner offers are variations between notes associated with her customer account and notes associated with the account of Mr. Jolly, also a client of Fisher Asset Management. Specifically, the notes associated with Petitioner's account do not have page numbers, internet address signatures, customer identification numbers, or show the date of printing. (D.I. 2, Exh. 2). Conversely, the notes associated with Mr. Jolly's account have all of these markings. (D.I. 2, Exh. 3 at 1-30). Petitioner maintains that the lack of these markings as to her account indicates that the notes were fraudulently modified.

Thomas Fishel, Chief Compliance Officer of Fisher Asset Management, provides a perfectly reasonable explanation of the variations via declaration. (D.I. 5, Exh. 1 at 1-4). Mr. Fishel swore to personal knowledge of Fisher Asset Management's use of Onyx software as a customer relationship management system. *Id.* at 1. The Onyx user interface is rigorously limited to specified employees and is used to memorialize interactions with clients. *Id.* at 2. Once a note is entered, it may not be modified in any manner. *Id.* Employees access Onyx software through Window's Internet Explorer. *Id.* at 1. Key to refuting Petitioner's allegations, Mr. Fishel swore that the printer settings are dependent on the individual employee's Internet Explorer preferences. *Id.* at 2. Printer settings may be customized to include any combination of a title, web address, page numbers, date in short format, date in long format, time in a 12-hour format, or time in a 24-hour format, but cannot alter the content of the Onyx notes. *Id.* Mr. Fishel swore

6

that the Onyx notes relating to both Petitioner and Mr. Jolly are true and correct records. *Id.* at 2-3. Finally, Mr. Fishel provided an additional set of Onyx notes relating to Petitioner's customer account printed with settings identical to those used to print Mr. Jolly's Onyx notes, which therefore include the similar header and footer information. *Id.* at 3; (*see* D.I. 5, Exh. 3 at 1-30). Petitioner offers no evidence in reply to Mr. Fishel's declaration. Petitioner thus failed to prove that the Onyx notes were fraudulent and their introduction at the arbitration hearing cannot warrant vacatur of the Arbitrator's decision.

Petitioner further argues that Respondents introduced false phone records at the arbitration hearing in support of Respondents' version of the events. Respondent Ruble testified that he left a voicemail message on Petitioner's cell phone at 8:46 a.m. on May 16, 2008 in order to arrange a conference call between himself, Petitioner, and Mr. Jolly. (D.I. 1, pp. 7-8). Ruble continued that Petitioner returned his call at 10:01 a.m. from her home telephone, and that at 10:04 a.m. he called Mr. Jolly's home, where Petitioner joined them on the line and the conference call took place. *Id.* at 8. Ruble testified that Petitioner approved the investment proposal and authorized investment of her funds at this time. *Id.* at 8-9.

Petitioner denies that any conference call took place and that she ever approved of the investment plan. (D.I. 1, p. 10). In support of her argument, Petitioner offers a certified Verizon Wireless "Call Detail Report" for May 16, 2008. (D.I. 2, Exh. 8 at 11). Petitioner correctly points out that these records do not show an incoming call from Respondents at 8:46 a.m., the time period Ruble testified to leaving the voicemail in order to arrange the conference call. *See id.* Fisher Assets Management's phone records, however, do show an outgoing call to Petitioner's cell-phone during this time period. (D.I. 2, Exh. 4 at 1284). Petitioner argues that this inconsistency proves that Fisher Assets Management's phone records are fraudulent.

7

Petitioner fails to prove the fact by clear and convincing evidence. Ruble did not testify that he actually spoke with Petitioner; he testified that he left a voicemail message, and Petitioner presents no evidence that an incoming "missed" or "straight to voicemail" call would appear on her Verizon Wireless "Call Detail Report." (*See* D.I. 1, p. 8). The Verizon Wireless report is thus not necessarily inconsistent with Ruble's testimony or Fisher Asset Management's phone records. Further, the most important conversation was the conference call where Petitioner is alleged to have given her investment authorization, and Petitioner fails to provide any phone records showing that this conversation did not take place. Petitioner thus fails to prove that Respondents' phone records were fraudulent.

Petitioner next argument for vacatur is that the Arbitrator committed misconduct under section 10(a)(3) of the FAA when he refused to "consider" the cell phone records. "The cases make clear that vacatur pursuant to section 10(a)(3) is warranted only where 'the arbitrator's refusal to hear proffered testimony "so affects the rights of a party that it may be said that he was deprived of a fair hearing."'" *Century Indemnity Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 557 (3d Cir. 2009) (internal citations omitted). Petitioner, however, does not show that she was deprived of a fair hearing. She does not even show that the Arbitrator refused to hear her testimony, or denied the introduction of phone records. In fact, her own petition for vacatur confirms that the Arbitrator did indeed allow introduction of the evidence, as Petitioner stated that she presented the inconsistent phone records at the hearing, to which the arbitrator responded, "so what?" (D.I. 1, p. 15). The fact that the Arbitrator was nonplussed by Petitioner's evidence does not warrant vacatur.

Further, the fact that the Arbitrator did not specifically address the inconsistency of the cell phone records in his written opinion does not mean that he refused to consider Petitioner's

8

evidence. Rather, it suggests that he did not view as persuasive Petitioner's characterization of that evidence as fraudulent. As stated by the Arbitrator, "[t]he burden of proving this claim of fraud is Ms. Bajaj's, and she simply fell short of bearing it." (D.I. 1, Exh. 1 at 12). For these reasons, the Court does not find that vacatur is warranted based on the Arbitrator's treatment of the cell phone records.

Finally, Petitioner argues that the Arbitrator refused to rule on her discovery requests for documents and admissions during a conference call on July 27, 2011, thereby prejudicing her right to a fair hearing under section 10(a)(3). Petitioner, however, fails to identify the nature of these allegedly key documents and admissions, and does not explain how they would have helped her prove her claims. (D.I. 1, p. 22). Further, she does not claim to have raised this issue at the arbitration hearing itself. The Arbitrator's written decision shows that he considered ample documentary and testimonial evidence and there is no reason to believe that his alleged failure to rule on the discovery requests prejudiced Petitioner's right to a fair hearing. *See id.* at 1-14.

For all of these reasons, the Court denies the petition to vacate and confirms the arbitration award in favor of Respondents.

### III. Motion for Attorneys' Fees

Respondents request attorneys' fees incurred in response to Petitioner's motion to vacate. "In suits to compel one party to submit to arbitration or abide by an award, fees are generally awarded if the defaulting party acted without justification, or if the party resisting arbitration did not have a reasonable chance to prevail." *Chauffeurs, Teamsters and Helpers, Local Union No. 765 v. Stroehmann Bros. Co.*, 625 F.2d 1092, 1094 (3d Cir. 1980). Such a decision is committed to the discretion of this Court. *See Wilkes Barre Hosp. Co., LLC v. Wyoming Valley Nurses Ass'n Pasnap*, 2011 WL 6000566, *2 (3d Cir. 2011). The Court finds that Petitioner had no basis to

9

resist the arbitration award. Petitioner's allegations of fraud against Respondents are purely based on the Onyx document variations and phone records discrepancies. It would have taken very little investigation to discover that Internet Explorer printer settings were capable of causing the inconsistencies between the Onyx documents. Further, Petitioner's argument that Respondents' phone records are inconsistent with those of Verizon Wireless and therefore raises an inference of fraud is not compelling, as she provides no proof whatsoever that Ruble's voicemail message would have shown up on Verizon Wireless' records. Petitioner's evidence of fraud is exceedingly flimsy and does not provide "a reasonable chance to prevail" under the clear and convincing standard required by the FAA.

Petitioner's argument that her rights were prejudiced via the Arbitrator's purported refusal to allow submission of her Verizon telephone records into evidence is even weaker, as her own petition notes that the Arbitrator heard and dismissed her arguments regarding the telephone records. Finally, Petitioner's effort to have the award overturned based on the Arbitrator's alleged failure to rule on a discovery request completely lacks the substance necessary for the Court to determine whether Petitioner's rights were actually prejudiced. The petition to vacate thus did not have any chance to prevail.

Respondents' counsel provided detailed billing records of their work on this case, showing fees in the amount of $21,000 for lead counsel and $4,641.88 for local counsel (D.I. 5, Exh. 11). The Petitioner filed nothing objecting to the requested amount and the Court has no reason to come to a different conclusion regarding the valuation of counsels' services. It does seem, however, that the better course would be to give Petitioner a chance to object to the reasonableness of the requested amounts, and the Court will do so.